STATE of Minnesota, Respondent,

v.

Grace Elaine CAMPBELL, Appellant.

No. CX–83–1347.

Supreme Court of Minnesota.

April 26, 1985.

Mary C. Cade, Minneapolis, for appellant.

Hubert H. Humphrey, III, Atty. Gen., St. Paul, Alan Mitchell, St. Louis County Atty., Duluth, Donovan W. Frank, Asst. County Atty., Virginia, Brian D. Simonson, Asst. County Atty., Hibbing, for respondent.

## OPINION

PETERSON, Justice.

Defendant, Grace Elaine Campbell, was found guilty by a district court jury of

second-degree murder and conspiracy to commit first-degree murder. She was sentenced to 232 months in prison, double the presumptive sentence for second-degree murder with a criminal history score of zero. On appeal, defendant raises the following issues: (1) whether the trial court prejudicially erred in not suppressing defendant's statements to police and the fruits of a consent search on the ground that the evidence was obtained in violation of her right to counsel, (2) whether admission of her sister's testimony violated defendant's right to counsel, (3) whether the trial court prejudicially erred in allowing the state to introduce evidence of an assault charge pending against defendant, (4) whether defendant's conviction for second-degree murder precluded her additional conviction for conspiracy to commit second-degree murder, and (5) whether the trial court erred in doubling the presumptive sentence for second-degree murder. We affirm.

Shirley Kykyri, a 42-year-old woman with less than normal mental capabilities, was brutally murdered in her Virginia, Minnesota, apartment on December 27, 1981. Two days before Kykyri's death, she reported to the police that she had been maced and raped in her apartment by a man she had previously seen with defendant, her neighbor, and that the man had threatened to kill her if she got him into trouble. The police questioned defendant about the alleged sexual assault, and she identified her fiance, Robert Kivimaki, as a possible assailant.

Examination of Kykyri's body, which was discovered on December 29, revealed that her throat had been cut from ear to ear and that her chest and back had been stabbed 17 times. Death had occurred rapidly, between 1 and 2 a.m. on December 27. According to Agent Floyd Bowman of the Minnesota Bureau of Criminal Apprehension, called in to investigate the murder, the absence of forced entry indicated that Kykyri knew her assailant, especially since her rape 2 days earlier made it unlikely that she would have admitted a stranger.

Kivimaki and defendant were individually interviewed at the police station shortly after Kykyri's body was found, although discovery of the body was not disclosed to them. Both were then released, and on December 31, 1981, they left Virginia for Dallas, Texas.

On February 13, 1982, Kivimaki's mother notified the police that she had received a letter from Kivimaki stating that defendant had left him. The letter continued: "I don't want to rot in prison. I want to kill myself for what I have done. That's what I deserve." The letter contained a holographic will and a postscript: "P.S. [Defendant] has to do as much as I did; she helped." After writing the letter, Kivimaki unsuccessfully tried to commit suicide.

Based on the letter, the St. Louis County Attorney's Office issued a complaint on February 15, 1982, charging Kivimaki and defendant with first-degree murder, and an arrest warrant followed. A week later, Detective James Bozicevich of the Virginia Police Department and Agent Bowman arrested the reunited couple at the Western Union Office in Las Vegas, after learning that defendant had asked her parents to wire her money there.

During questioning at a Las Vegas police station, Agent Bowman began reading defendant her *Miranda* rights, but she interrupted him, saying, "If I'm going to be charged with murder, maybe I should talk to an attorney." Bowman immediately ceased the questioning, told her "it was up to her," and went to question Kivimaki, who was in another room. Defendant made no further reference to an attorney. Detective Bozicevich remained in the room with defendant, but he refused to discuss the homicide when defendant tried to raise the subject.

After Agent Bowman questioned Kivimaki, who denied any involvement in the murder, he stood outside the door to defendant's room. Defendant initiated a conversation with Bowman, asking, "If I tell you what I know, will it be any easier on me?" Bowman told her he could not make any promises but that it might be better to

straighten things out if she was not involved.

After being advised of her constitutional rights, defendant told Agent Bowman that Kivimaki had stabbed Kykyri to death to prevent her from identifying him as her assailant. On the evening of Kykyri's death, defendant drank a beer with Kykyri in Kykyri's apartment and questioned her about the sexual assault. Defendant later confronted Kivimaki about the rape, and he admitted it, stating that he was frightened of being identified by Kykyri and that he was going to kill her. Kivimaki and defendant, who was very intoxicated, drank a few more beers. The next thing defendant remembered, she was standing in Kykyri's apartment, about 8 to 9 feet from Kykyri, and Kivimaki was "slicing" Kykyri's throat and stabbing her repeatedly with a steak knife from defendant's kitchen. Defendant told him to stop. Kivimaki then ran to defendant's apartment and defendant followed, closing Kykyri's door behind them. Defendant stated that Kivimaki wore some of her clothes to avoid getting blood on his own and that she helped him clean up after the murder, burn the clothes and a shirt defendant had been wearing that had a blood spot on it, and dispose of the murder weapon. Defendant further informed Agent Bowman that she had maced a bouncer at a nightclub in Virginia on December 22, 1981, 5 days before the murder, and that she left with Kivimaki for Dallas to avoid possible assault charges stemming from a warrant she received on December 30, 1981, about that occurrence.

Defendant made another statement the next day, after again being informed of her constitutional rights. She claimed not to remember how she got into Kykyri's apartment or if she helped Kivimaki get into the apartment by knocking on the door and macing Kykyri.

Defendant and Kivimaki waived extradition and on February 26, 1982, were taken to the Las Vegas airport. It was the first time since their arrest that the couple had been together, and they seemed happy to see each other. During the drive to the airport, defendant suggested to Kivimaki that he tell the police what had happened. Once on the plane, Kivimaki confessed to killing Kykyri. In his taped statement, admitted into evidence at defendant's trial, Kivimaki claimed that defendant knocked on Kykyri's door and sprayed mace on her face, allowing Kivimaki to enter Kykyri's apartment and stab her to death. Kivimaki also stated that defendant helped plan the murder, picked out the knife, gave him clothes to wear, volunteered to help get into Kykyri's apartment, and helped clean up after the murder.

After statements were taken from the suspects in St. Paul, they were driven to Virginia. En route, Kivimaki pointed out where he had burned the clothes and where he had thrown the knife. A police detective later recovered fragments of women's clothing and work gloves, but the steak knife was never found. On March 1, 1982, however, defendant consented to allow police to search her apartment, and she showed them another knife she claimed was identical to the murder weapon. During this search, the police also recovered a rug with bloodstains on it that were consistent with Kykyri's blood type.

On March 18, 1982, defendant and Kivimaki were formally indicted by a grand jury on two counts of murder in the first degree and one count of conspiracy to commit murder in the first degree. Kivimaki was found guilty of first-degree murder.[1] At defendant's trial, Kivimaki recanted his confession, as he had done at his own trial. He claimed that defendant went to Kykyri's apartment in a rage and killed her after learning that he and Kykyri had engaged in sexual intercourse. Kivimaki testified that his statements admitting the killing were "[defendant's] story" and that he took the blame to protect her.

---

1. We upheld Robert Kivimaki's first-degree murder conviction in *State v. Kivimaki,* 345 N.W.2d 759 (Minn.1984).

Defendant's testimony also differed somewhat from her earlier statements, since she claimed to remember how she got into Kykyri's apartment. Defendant stated that she told Kivimaki to quit talking about killing Kykyri and then closed her eyes. Upon opening her eyes 2 or 3 minutes later, defendant noticed that Kivimaki was gone, as were his gloves and a knife that had been on the kitchen table. Defendant ran to the hallway and, upon seeing that Kykyri's door was open, entered Kykyri's apartment. She saw Kivimaki push Kykyri down and cut her throat, and, as defendant turned around, a spot of blood hit her arm. She said, "Oh my God, Bob, stop." Kivimaki, who was covered with blood, turned and ran out of the apartment. Defendant followed, closing the door as she went. Defendant denied having helped Kivimaki clean up after the murder, although she did admit that she went with him to dispose of the clothes. She stated that she was not involved but was merely a witness and that she had gone to Dallas with Kivimaki to avoid prosecution for macing a bouncer.

On January 20, 1983, defendant was acquitted by the jury of first-degree murder but was found guilty of second-degree murder and conspiracy to commit first-degree murder while committing or attempting to commit tampering with a witness.

1. Neither party contests that defendant's fifth amendment right against self-incrimination and her sixth amendment right to counsel had attached at the time she made her first statement to the police in Las Vegas. Defendant contends that the trial court improperly admitted her statements, as well as the fruits of the March consensual search of her apartment, because the statements and consent to search were obtained in violation of her fifth and sixth amendment rights.

■ The fifth amendment guards an individual's right against self-incrimination. For an incriminating statement taken from an accused during custodial interrogation to be admissible, it must be shown that defendant knowingly and intelligently waived the right against self-incrimination, *Miranda v. Arizona*, 384 U.S. 436, 475, 86 S.Ct. 1602, 1628, 16 L.Ed.2d 694 (1966), and that the statement was freely and voluntarily made, *see Haynes v. Washington*, 373 U.S. 503, 513, 83 S.Ct. 1336, 1343, 10 L.Ed.2d 513 (1963); *State v. Kivimaki*, 345 N.W.2d 759, 762 (Minn.1984).

We have previously outlined the analysis to be followed in determining the voluntariness issue:

In an ordinary case if the prosecutor shows that the warning was given and that defendant stated he understood his rights and then gave a statement, the state will be deemed to have met its burden of proof, unless there is other evidence indicating that there was no knowing, intelligent, and voluntary waiver.

However, if there is other such evidence, then the trial court must make a subjective factual inquiry to determine whether under the totality of the circumstances the waiver was knowing, intelligent, and voluntary. This is the same kind of inquiry basically that is made to determine whether a statement is "voluntary" within the meanings of the traditional voluntariness requirement. Factors to be considered include age, maturity, intelligence, education, experience, ability to comprehend, lack of or adequacy of warnings, length and legality of detention, nature of interrogation, physical deprivations, limits on access to counsel and friends, and others.

*State v. Linder*, 268 N.W.2d 734, 735 (Minn.1978) (citations omitted).

■ Here it is undisputed that *Miranda* warnings were given at all appropriate times and that defendant each time acknowledged that she understood and waived her rights. In addition, the conduct of the police before defendant's first statement indicates that she was not pressured into making that statement. Defendant attempted to initiate communication about the murder with Detective Bozicevich but on Agent Bowman's instructions, Bozicevich refused to discuss the matter with

defendant. When she saw Bowman, defendant clearly initiated communication with him, even calling him into the room. Bowman then explained what would happen next, including the grand jury proceeding. He next taped a reading to defendant of her *Miranda* rights and her response that she understood them. Only then did Bowman begin questioning defendant. Defendant was a high school graduate, and Bowman testified that she was not under the influence of alcohol or drugs. Thus, defendant voluntarily waived her fifth amendment rights under the federal constitution.

■ Defendant contends that her waiver was invalid because she had previously invoked her right to counsel. We disagree that defendant, by her statement, "if I'm going to be charged with murder maybe I should talk to an attorney," invoked her right to counsel, and she made no further reference to an attorney. Even if defendant had invoked her right to counsel, the United States Supreme Court has established that a fifth amendment waiver of counsel is valid after a defendant has invoked the right if the state proves that the accused was not interrogated until counsel had been made available, or that "the accused himself initiate[d] further communication, exchanges, or conversations with the police." *Edwards v. Arizona*, 451 U.S. 477, 484–85, 101 S.Ct. 1880, 1884–85, 68 L.Ed.2d 378 (1981); *Oregon v. Bradshaw*, 462 U.S. 1039, 103 S.Ct. 2830, 77 L.Ed.2d 405 (1984). Defendant clearly initiated all further communication with the police.

■ Defendant also contends that her statements and consent to search her apartment were given in violation of her sixth amendment right to counsel. Although the sixth amendment right to counsel and the fifth amendment right against self-incrimination are based upon different policies and differ as to when each right attaches, the validity of each waiver of counsel should be judged by the same standard—"whether under the facts of the case there was a voluntary, knowing and intelli-

gent abandonment or relinquishment of a known right or privilege." *State v. Kivimaki*, 345 N.W.2d 759, 763–64 (Minn.1984) (citing *Fields v. Wyrick*, 706 F.2d 879, 881 (8th Cir.1983), *cert. denied*, —— U.S. ——, 104 S.Ct. 556, 78 L.Ed.2d 728 (1983)). Accordingly, defendant's waiver of her sixth amendment right to counsel was also valid under the federal constitution.

■ 2. Defendant's sister testified that while in jail defendant admitted to her that she helped Kivimaki get into Kykyri's apartment and that she maced Kykyri. Defendant claims that this testimony should be excluded as a violation of her sixth amendment right to counsel because, unknown to defendant, her sister was acting as a government informant.

Defendant's claim of error is patently without merit. In *Massiah v. United States*, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964), and *United States v. Henry*, 447 U.S. 264, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980), the United States Supreme Court excluded incriminating statements that were deliberately elicited from a defendant by one who, unknown to the defendant, was a government informant. Although defendant's sister admitted that she deliberately elicited the statements, however, defendant has not shown that her sister was acting as a government informant. Defendant does not contend that Agent Bowman or any other officer told her sister either to elicit information or to report information she received from defendant. She claims only that Bowman frequently contacted her sister, which Bowman stated was no more than his usual contact with a witness. That defendant's sister reported to the police a confession she deliberately elicited from her sister and perhaps had frequent contact with the police does not make her a government informant within the meaning of *Massiah* and *Henry*.

3. Defendant next argues that the trial court erred in admitting testimony regarding defendant's pending fourth-degree assault charge for macing a bouncer at a bar

on December 22, 1981, 5 days before the murder.

■ Rule 404(b) of the Minnesota Rules of Evidence provides that evidence of other wrongs is not admissible to prove character, but may be admissible "for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Minn.R.Evid. 404(b). In applying this rule, we have held that the "preferred approach" is to "analyze the evidence and determine if the evidence is relevant and material to the state's case, if the evidence of the defendant's participation in the offense is clear and convincing, and if the probative character of the evidence outweighs its potential for unfair prejudice." *State v. Filippi*, 335 N.W.2d 739, 743 (Minn.1983). The decision whether to admit evidence of other crimes is largely within the discretion of the trial court. *State v. Saucedo*, 294 Minn. 289, 293, 200 N.W.2d 37, 40 (1972).

■ In this case, it is uncontested that the macing incident was proven by clear and convincing evidence. Moreover, we conclude that the evidence was relevant and not "merely cumulative and a subterfuge for impugning defendant's character or for indicating to the jury that he is a proper candidate for punishment." *State v. Billstrom*, 276 Minn. 174, 179, 149 N.W.2d 281, 284-85 (1967). Although the state had other, unchallenged evidence connecting defendant with mace—the day before the murder she showed a police officer mace she carried in her purse, and her former boyfriend testified that she had maced him 2 years before—the trial court had ample reason to admit evidence of the most recent macing incident. The extent of defendant's involvement in the murder, including whether she maced the victim, was at issue, and that she had used mace to disable an individual 5 days before was significant. It showed that defendant had knowledge of how to use mace and of its debilitating effects and had the opportunity to use mace since the can in her purse was probably still in good working order at the

time of the murder. Defendant also contends that the relevance of the evidence was insufficient to outweigh its potential for unfair prejudice. We cannot conclude that the trial court abused its discretion in admitting this evidence of a pending fourth-degree misdemeanor charge. Moreover, introduction of this assault charge arguably aided defendant's case, since she claimed that she left Minnesota with Kivimaki not because she was involved in the murder other than as a witness but to avoid the pending assault charge.

■ 4. There is no merit to defendant's contention that her conviction for conspiracy to commit first-degree murder while tampering with a witness should be vacated under Minn.Stat. § 609.04 (1984) as a lesser included offense of her conviction for second-degree murder. The approach taken by this court is that "the trial court must look at the statutory definitions rather than the facts in a particular case to determine if a lesser offense is necessarily included." *State v. Gayles*, 327 N.W.2d 1, 3 (Minn.1982). Arguably, defendant was convicted of second-degree murder solely because she aided and abetted Kivimaki, and we have never determined whether the relevant statutory definition when one is convicted of an offense because of aiding and abetting is that of the actual offense or that of aiding and abetting. We need not decide that in this instance, however, because under either the definition of second-degree murder in Minn.Stat. § 609.19, subd. 1 (1984), or that of aiding and abetting in Minn.Stat. § 609.05 (1984), defendant's conviction was not for a lesser included offense.

■ 5. Defendant's final contention is that the trial court erred in sentencing her to 232 months, double the presumptive sentence for second-degree murder for an individual with a prior history score of zero.

We hold that the trial court enumerated sufficient aggravating factors to justify the departure. There is evidence that defendant knew, or should have known, that Kykyri had below-normal mental capabili-

ties and that this aided commission of the crime because it led Kykyri to open her door sometime after midnight to a woman she knew was acquainted with a man who had raped her two nights before. Minnesota Sentencing Guidelines and Commentary II.D.b.(1) (1984); *see State v. Gardner*, 328 N.W.2d 159 (Minn.1983) (vulnerability of victim not an aggravating factor unless it was a "substantial factor" in defendant's accomplishment of crime). Similarly, that defendant violated a position of trust by convincing Kykyri to open the door is an aggravating factor we have previously recognized in a murder case. *State v. Schmit*, 329 N.W.2d 56, 58 (Minn.1983).

In addition, the murder was committed with particular cruelty. Minnesota Sentencing Guidelines and Commentary II.D.b.(2) (1984). The murder took place in the victim's home. *See, e.g., State v. Jones*, 328 N.W.2d 736 (Minn.1983); *State v. Norton*, 328 N.W.2d 142 (Minn.1982). There is evidence that defendant gratuitously maced the victim, an action we have previously recognized as indicating cruelty. *State v. Schantzen*, 308 N.W.2d 484 (Minn. 1981). Further, even if defendant did not inflict the brutal injuries and psychological terror which proceeded and were part of the murder, as a participant she was legally responsible for these actions under Minn.Stat. § 609.05 (1984). *State v. Jones*, 328 N.W.2d 736 (Minn.1983).

Defendant argues that the court should have considered her passive participation as a mitigating factor. Whether defendant played a passive role in the offense is the type of factual issue best decided, in most cases, at the trial court level. *State v. Carson*, 320 N.W.2d 432, 438 (Minn.1982); *see also State v. Back*, 341 N.W.2d 273, 275 (Minn.1983). The evidence justifies the conclusion that defendant was not a passive participant but helped plan the crime, helped Kivimaki gain access to the apartment, and helped conceal the crime afterward. The trial court therefore did not abuse its discretion in refusing to view defendant as a "passive" participant.

Affirmed.